

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-28-2001

# Evans v. Port Auth NY & NJ

Precedential or Non-Precedential:

Docket 00-1919

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Evans v. Port Auth NY & NJ" (2001). *2001 Decisions.* Paper 279.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/279

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 28, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-1817 and 00-1919

JANET L. EVANS

v.

PORT AUTHORITY OF NEW YORK AND NEW JERSEY;
ANGELO DINOME; LAURA TOOLE
        Port Authority of New York and
        New Jersey,
        Appellant in No. 00-1817

JANET L. EVANS
        Appellant in No. 00-1919

v.

PORT AUTHORITY OF NEW YORK AND NEW JERSEY;
ANGELO DINOME; LAURA TOOLE

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 95-cv-5094)
District Judge: Honorable Katharine S. Hayden

Argued July 16, 2001

Before: MANSMANN, SCIRICA and RENDELL,
Circuit Judges.

(Filed: November 28, 2001)

Raymond L. Hamlin, Esquire
Terry Ridley, Esquire (ARGUED)
Hunt, Hamlin & Ridley
60 Park Place
Suite 1602
Newark, New Jersey 07102

 Counsel for Appellant
in No. 00-1817
And Appellee in No. 00-1919

Hugh H. Welsh, Esquire
Donald F. Burke, Esquire (ARGUED)
Port Authority of New York &
 New Jersey
One Riverfront Plaza
Suite 327
Newark, New Jersey 017102

 Counsel for Appellee
in No. 00-1817
And Appellant in No. 00-1919

OPINION OF THE COURT

MANSMANN, Circuit Judge.

In this action alleging racial discrimination in violation of 42 U.S.C. SS 1981 and 1983, and Title VII, the jury returned a verdict in favor of Janet Evans, finding that her employer, the Port Authority of New Jersey, discriminated against her when it failed to promote her to the position of client manager in 1994. Evans was awarded back pay, front pay, and compensatory damages. The District Court also granted her request for attorney's fees. The Port Authority contends that the District Court erred in denying its motion for a new trial as to liability and damages, and in calculating the amount of the fee award. Evans cross-appeals, contending that the District Court erred in granting the Port Authority's motion for remittitur and in failing to allow the jury to consider the issue of punitive damages.

2

Because we are convinced that the Port Authority's allegations of error relating to the liability portion of the verdict clearly lack merit, we direct our primary attention to the damage and attorney's fees awards. Although we recognize that the award for emotional damages is atypical, and though we may have arrived at a different calculation had the award been ours to determine in the first instance, we find that the figure set by the District Court has substantial support in the record. The attorney's fees award is more problematic. Our review of the billing records submitted by Evans' counsel establishes that the District Court did not devote adequate attention to the hours expended and the duplication of effort by Evans' attorneys; reduction in the fee award is warranted. For the reasons set forth herein, we will conditionally affirm the order of the District Court denying the Port Authority's motion for a new trial and granting its motion for remittitur. We will vacate the District Court's order approving the award of attorney's fees and will remand this matter for a recalculation of the award.

I.

In 1993, Janet Evans, a Port Authority employee since 1979, worked as a liaison between the Port Authority and government and business officials. The same year, Evans applied and was interviewed for the Port Authority position of client manager. Eight total candidates were considered, including four white candidates, three black candidates, and one Hispanic applicant. Three of the candidates, Evans, Laura Toole, and Dan Maynard, were interviewed by Angelo Dinome, a white male.

In January 1994 Evans learned that the client manager position would be filled by Toole, a white female. She also learned that Maynard, a white male, had been promoted to the position of senior information officer. This position had never been advertised and Evans was not aware that it was open. Evans challenged Toole's appointment and Maynard's promotion, claiming that each was the result of discrimination based on race. She filed a complaint alleging racial discrimination with the EEOC in April 1994. The

3

EEOC did not find probable cause to support Evans' allegations, but did issue a right to sue letter.

On October 3, 1995, Evans filed a timely complaint in the District Court of New Jersey, alleging that "the actions of the [D]efendant[ ]1 in failing to promote her to the position of client manager were designed to deny her the opportunity for growth and [to] prevent her from advancing in the Port Authority solely on the basis of her race." She maintained, too, that the Port Authority provided"greater attention, benefits and support to non-African American employees by way of preference for certain bonuses, incentives, and salaries." Evans contended that the appointment of Toole and the promotion of Maynard constituted proof of the Port Authority's impermissible preference.

Following a multi-day jury trial in August 1999, the jury found that the Port Authority violated 42 U.S.C.SS 1981 and 1983, and Title VII when it failed to promote Evans in 1994. The jury awarded Evans $148,000 in back pay, $182,000 in front pay, and $1.15 million in compensatory damages.

The Port Authority filed a motion for judgment N.O.V. or, in the alternative, for new trial.2 After evaluating thoroughly on the record each of the grounds asserted, the District Court denied the Port Authority's motions. The District Court instead granted the Port Authority's request for remittitur, reducing Evans' compensatory damages for

_____

1. An amended complaint named Angelo Dinome and Laura Toole as defendants. These individuals were never served and are not parties to this action.

2. The Port Authority claimed entitlement to a new trial on seven grounds: 1) the verdict was contrary to the evidence and the law; 2) the evidence viewed most favorably to Evans was insufficient to support liability; 3) the damage awards were excessive; 4) the District Court erred in excluding from evidence the determination letter issued by the EEOC; 5) remarks made by Evans' counsel during summation were sufficiently prejudicial to warrant a new trial; 6) the District Court erred in "allowing testimony with reference to the 1998/1999 client manager selection process;" and 7) the District Court "erred in barring the testimony of two witnesses on behalf of [the] Port Authority."

4

emotional distress to $375,000. Ultimately, the District
Court approved a request for attorney's fees made by
Evans' counsel in the amount of $635,555.71.

The Port Authority filed this timely appeal raising issues
relevant to liability, damages, and fees. Evans filed a timely
cross-appeal raising issues bearing solely upon damages.

II.

We turn first to the Port Authority's argument that it is
entitled to a new trial on the question of liability. The Port
Authority bases this argument on allegations of error which
include the District Court's admitting or excluding multiple
items of evidence, permitting allegedly inflammatory
comments made by counsel for Evans during summation,
and inadequately charging the jury.3 These allegations do
not merit extended discussion. We have conducted a
meticulous review of the record as it bears upon each of
these alleged errors and are convinced that the District
Court's rulings were supported by the law and the facts
and were consistent with the sound exercise of judicial
discretion.4 We do not find anything in the record to

_____

3. The Port Authority alleges specifically that the District Court erred:
in
admitting evidence regarding the filling of a client manager position open
in 1999; excluding evidence of the EEOC finding of"no discrimination";
permitting Evans' counsel to question a Port Authority employee
regarding his status in two other lawsuits; allowing an Evans' co-worker
to testify as to her reaction to the promotion process; admitting Evans'
statements regarding her qualifications, views of the promotion process,
and interview notes; excluding check lists and notes relevant to other
candidates; and permitting Evans' counsel to make inflammatory
remarks during summation. The Port Authority also alleges that the
District Court erred in instructing the jury with respect to disparate
impact, and failed to instruct the jury regarding the theory of respondeat
superior and causation.

4. With respect to a number of the alleged errors, there is support in the
record for application of a plain error standard. Most of the evidentiary
decisions about which the Port Authority complains were made without
objection, or were influenced by the Port Authority's failure to comply
with the District Court's admonition to make submissions in a timely
manner or to lay a proper foundation for evidence which it sought to

5

support the Port Authority's assertion that the District Court erred in failing to grant a new trial with respect to liability.

III.

We focus next upon the components of the damage award, considering first the Port Authority's contention that the front and back pay awards must be vacated because the District Court failed to give the jury clear instructions as to how these awards were to be calculated.

Examination of the record establishes that the Port Authority never objected to and, in fact, agreed to the adequacy of the front and back pay instructions. We have reviewed those instructions and find that they gave the jury ample guidance as to the law and the method of calculating these awards.

We reject, too, the Port Authority's contention that the evidence submitted to the jury was insufficient to support the awards. Again, context is important. As the District Court made clear in its ruling on the Port Authority's motion for a new trial, the quality of the evidence introduced with respect to front and back pay lay largely in the hands of the Port Authority; the Port Authority was responsible for and should not now be heard to complain about lack of detail in the evidence. The position of the District Court is set forth in the transcript of the ruling on the motion for a new trial:

> The Court: I will not permit, in light of what I just read and the struggles that [Evans] had to undergo to get basic, basic, salary information, from which [she] could workup [sic] some kind of a chart or graph, or. . .

_____

introduce. It is also clear that the jury instructions to which the Port Authority now objects were, at the very least, acquiesced to by counsel for the Port Authority prior to the charge. The Port Authority failed to object to these instructions at the time that they were delivered or prior to the time that the jury retired to consider its verdict. Because we have not found error under the more stringent abuse of discretion standard, it follows that we do not find plain error.

some kind of easy specifics for this jury to work with,
I will not permit [the Port Authority] to attack the
manner in which this financial information ultimately
was presented to the jury.

As I recall eventually we did receive the numbers --
was there a stipulation ultimately worked out, counsel?

[Counsel for Evans]: Yes.

[Counsel for the Port Authority]: Yes.

The Court: Flat out numbers. That are consistent with
the findings [the jury] made about what [Evans] had
lost by being deprived of the promotion that she sought
. . . brought forth and into the future. The . . . jury was
told about how old [Evans] was. What her career path
had been. About her devotion to her job. She testified
that she had an interest in remaining in her position
and pursuing promotions along the line of work that
she was doing. And she was quite specific . . . about
that . . . .

* * * *

Therefore, I am not disturbing the jury's awards on
front and back pay.

(Evans App. G, p. 26–27). We, too, decline to disturb the
jury's calculation of the front and back pay awards.

IV.

We next address the Port Authority's contention that it is
entitled to a new trial because the jury's compensatory
damage award of $1.15 million "was not supported by the
evidence and was grossly excessive, `reflect[ing]' a jury
driven by mistake, passion, prejudice or partiality."

We review the District Court's decision not to grant a new
trial for abuse of discretion. Our precedent establishes that
a District Court reviewing a jury verdict has an "obligation
. . . to uphold the jury's award if there exists a reasonable
basis to do so."  Motter v. Everest & Jennings, Inc., 883 F.2d
1223, 1230 (3d Cir. 1989). "[T]he court may not vacate or
reduce the award merely because it would have granted a

7

lesser amount of damages." Id. A new trial is warranted based "upon [a] showing that `the jury verdict resulted from passion or prejudice.' " Hurley v. Atlantic City Police Depart., 174 F.3d 95, 114 (3d Cir. 1999), cert. denied , 528 U.S. 1074 (2000) (quoting Dunn v. HOVIC, 1 F.3d 1371, 1383 (3d Cir. 1993)). "[T]he size of the award alone [is not] enough to prove prejudice and passion." Id. The Port Authority argues that because of allegedly improper evidentiary and other trial errors, the jury could not have been impartial in determining compensatory damages.

Because we have rejected the allegations of error upon which the Port Authority bases its impartiality argument, we reject as well the Port Authority's argument that the alleged errors tainted the jury's verdict. Nonetheless, we have an obligation, as did the District Court, to ensure that the compensatory damage award finds support in the record and that the jury did not "abandon analysis for sympathy." Gumbs v. Pueblo International, Inc., 823 F.2d 768, 773 (3d Cir. 1987).

Recognizing this obligation, the District Court discussed in great detail the evidence supporting an award of compensatory damages,5 specifically rejecting the Port

_____

5. This evidence consisted solely of Janet Evans' testimony:

[As a result of the Port Authority's actions] I started having chest
pains and shortness of breath. I was sent to the[Port Authority]
medical department [on] four, five different occasions, had an EKG
taken and [was] sent home and I started taking blood pressure
medicine. I have also been moody and irritable all of the time. And
it affected my relationship with my children.

I was a grouch. Okay. Candidly I was a grouch. Affected my
relationship with my husband.

I was a grouch. I am sure I could use another word, but I will say
grouch for the court. It affected me on almost every level of my
existence. It made me question my ability. I said to myself, you
know, maybe I am not as smart as I think I am. Maybe I can't do
this and, you know, I am only doing this for at the time 17, 18
years, maybe I don't have the stuff it takes to do this.

And then I had to get myself together and talk to somebody
professionally and -- I renewed my spirit, because I think that if you

8

Authority's argument that the jury's verdict was the result of passion or prejudice. The Court found that the jury, in awarding compensatory damages, considered Evans' demeanor and testimony against the background of the testimony and demeanor of Port Authority witnesses:

> One of the things that judges have to do in examining the challenge to whether a jury was carried away by bias and passion and prejudice and sympathy and all of the other wrongful motives, in awarding a large award of damages. It was what went on in the courtroom and the judges own observations of the jury. And I remember that moment very clearly, as a moment in which this jury was struck as forcibly as it could be struck by [the Port Authority's witness's] certainly inadvertent description of this process as a joke.
>
> I find that the demeanor of [this Port Authority witness], which was alternatively somewhat arrogant, somewhat embarrassed and generally unpersuasive . . . was a typical kind of reaction given, the substance of what was slowly but surely being demonstrated to this jury.
>
> * * * *
>
> [I]t is very important to me to examine [Evans'] testimony and what she put in by way of proofs with what exactly was proven to this jury by the testimony with the very people who could have and should have and [in] some cases did respond to her but responded

_____

> let it, what happens to us African Americans is, okay, it can drive you crazy if you let it, and people go into offices and shoot people up and do all kinds of things. If you allowed the anger that develops as a result of constantly being made to feel you are not as good as, if you don't have some strong faith, some strong--
>
> * * * *
>
> I had my parents, I had my God. And as a consequence I kept my mind; but I was in bad shape. Okay. And I am still angry.

(Port Auth. App. X, p. 93-96.)

9

to her in [a way] that was totally oblivious of . . . her concerns, which could not have been more clearly expressed.

I find that as much as her testimony about . . . her disposition, her relationship with the people nearest and dearest to her, the family and her children and her husband, is the observation that she made. [S]he herself was designated to train the very people who were brought in from the outside to fill a position, which she was part of the creation of and which she far better than they could have filled . . . Much more importantly, the impact of being asked to train the very people who were filling the job on a consistent level that one is not promoted [to], is an enduring and long standing curb on the ability to enjoy one's job that cannot be ignore[d] by the Court.

* * * *

Janet Evans had a tremendous impact on this jury, there is no doubt in this Court's mind, I was here, and I sat the closest to her, of anybody, and I had the direct view of how the jury reacts . . . [T]his jury liked Janet Evans not because she pandered to them . . . [Her] demeanor . . . was that of a proud, accomplished, intelligent woman whose faith in herself was shattered by consistent refusal . . . to give her what she felt rightly was [hers] . . . .

(Evans App. G. p. 55-59.) The District Court also concluded that the verdict was not the result of undue sympathy on the part of the jury:

[I] don't find, either from what was on the record or from the amounts awarded, that this was a run away jury . . . .

They were instructed frequently . . . that they were not to let passion or prejudice blind them. . . . They were reminded frequently they should use their common sense in their own collective judgment. I find that is what happened here with respect to the jury's findings. Particularly, as they are supported by the evidence.

10

(Evans App. H. p. 96-97)

Based on the District Court's observations with respect to the totality of the evidence, the demeanor of the witnesses, and the reaction of the jury, we are unable to conclude that the jury verdict resulted from passion or prejudice. Consequently, we find that the District Court's decision to deny the Port Authority's motion for a new trial was consistent with the sound exercise of judicial discretion.

V.

Although the District Court rejected the Port Authority's argument that the compensatory damage verdict returned by the jury required that a new trial be granted, the Court did find that the award was excessive. Accordingly, the Court granted remittitur to $375,000, an amount it characterized as "the maximum award that a reasonable jury could impose in this case."

The Port Authority does not argue on appeal that the $375,000 award is excessive. We are instead presented with the anomalous situation where it is the plaintiff who challenges the remittitur. Normally, where a District Court denies a defendant's motion for a new trial as to damages, yet concludes that a jury verdict is excessive, warranting remittitur, denial of the motion for new trial is conditioned on the plaintiff's acceptance of the remittitur. Any remittitur accepted by the plaintiff in that situation is not appealable. See Lowe v. General Motors Corp., 624 F.2d 1373, 1383 (5th Cir. 1980). The order denying the Port Authority's motion for a new trial on the issue of damages here was not conditioned on Evans' acceptance of the remittitur. Thus, Evans appeals, asking that we reinstate the jury's verdict awarding her $1.15 million in compensatory damages.

Our role in reviewing the District Court's decision to remit the damage award here is "severely limited." Gumbs, 823 F.2d at 771. The use of remittitur "clearly falls within the discretion of the trial judge, whose decision cannot be disturbed by this court absent a manifest abuse of discretion." Spence v. Bd. of Educ. of the Christina Sch. Dist., 806 F.2d 1198, 1200 (3d Cir. 1986). "The district

11

judge is in the best position to evaluate the evidence presented and determine whether or not the jury has come to a rationally based conclusion." Id. at 1201. Where the District Court has decided that remittitur is appropriate, we must accord that decision additional deference. Delli Santi v. CNA Ins. Co., 88 F.3d 192, 206 (3d Cir. 1996). "[W]e must give the benefit of every doubt to the judgment of the trial judge." Gumbs, 823 F.2d at 773.

Evans does not cite any other discrimination case from any other jurisdiction where an award approaching the jury's verdict of over $1 million was sustained. Nonetheless, we recognize that the issue to be decided here "is not the size of the award alone, but the evidence supporting the award." Blakely v. Continental Airlines, Inc. , 992 F. Supp. 731, 737 (D.N.J. 1998). Evans' attempt to justify the size of the award by reference to the record is unpersuasive. She summarizes the evidence supporting the original verdict as follows:

> [Evans'] testimony clearly established the invidious effect of race discrimination upon a human being. . . . She was made to suffer the indignity of being qualified for a job and being turned down nine times. She was upset, she was traumatized, she would, on occasion become ill. This sorry state occurred over a period of ten years.

Although we agree with Evans that "racial discrimination is vicious, destructive, and debilitating," we are not persuaded that the evidence of emotional distress adduced here is remotely sufficient to support the jury verdict. The verdict was "so large as to appear contrary to reason," and the District Court's decision to grant remittitur was well within the discretion reserved to it. Blakely , 992 F. Supp. at 735.

Our examination of the remitted award does not end here. Despite the fact that the Port Authority does not challenge the $375,000 award as excessive, we have an independent responsibility to review the award in order to determine if it is rationally based. Our precedent recognizes "an increasing appellate trend to review the merits of a damage award, even though our scope of review is limited."

12

Williams v. Martin Marietta Alumina, Inc., 817 F.2d 1030 (3d Cir. 1987). In order to satisfy our obligation we must, according the benefit of any doubt to the judgment of the District Court, assess whether the District Court erred in fixing Evans' damages for emotional distress at $375,000.

On review, we may not require the District Court fixing a remittitur to reduce an award to less than the largest verdict that could be allowed without requiring a new trial. That is, remittitur should be set at the " `maximum recovery' that does not shock the judicial conscience." Gumbs, 823 at 774. The District Court specifically applied this maximum recovery rule:

> Applying the Gumbs line which is . . . the line between an excessive jury award and the maximum award that a reasonable jury could impose in this case [,] I am granting remittitur . . . to $375,000.

(Evans App. p. 117) The District Court then turned to the evidence supporting this award. Because this evidence is critical to our review, we cite the District Court's comments at some length:

> Judges must proceed with caution when a challenge to an award is based upon emotional distress. . . . One of the ways in which I would respond to that challenge is to consider the demeanor of the jury and what went on in front of the jury which may have [led it] to conclude that [its] empathic abilities could be exercised a certain way. . . .
>
> [W]hen the jury heard distressful testimony or observed witnesses squirming or coming out with arguments or statements like Mr. Codd that he considered the lawsuit to be a joke. That this shows how inflamed the jury was. And how much it wanted to slam the Port Authority. I disagree.
>
> I think that it demonstrates a certain amount of drama that went on here and that the jury is enabled to get a glimpse of what was the evidence that it was describing. Not glimpses into things that the jury had no evidence of and could only speculate about, but things that Miss Evans described. Such as her feelings

13

of -- I don't know if she said the word worthless, but she began to doubt herself. Indications as to whether or not all of this was worth it and . . . she called herself a grouch. I would take the liberty of saying . . . that Miss Evans kind of smiled and said grouch . . . and we all know that she meant bitch. . . .

I find that the moments I've described were such-- where Miss Evans by dint of her own personality that of a strong professional woman that I earlier described, did not indicate such distress as would make it impossible for her to go to work. The jury could still have had an insight of what it was like to work in an environment where people said such things as Mr. Breznoff said, and yet did things as Mr. Breznoff did, or called for. Called her lawsuit a joke. Or where her supervisors, even though they had far less experience and even though promoted to the jobs through routes that she could not have access to because of the departmental option.

These are important things because there has been a challenge that the level of emotional distress argued for by this plaintiff is not supported by the evidence.

(H 106-109)

In sum, the District Court concluded that the evidence supporting the award of damages for emotional distress was not comprised of Evans' testimony alone. Evans' account of the physical and emotional toll of working at the Port Authority was, in the District Court's view, supported -- and dramatically so -- by the demeanor and testimony of Port Authority witnesses.

Analyzing the evidence in light of governing precedent, the District Court found that the maximum reasonable award for emotional distress totaled $375,000. The District Court recognized, as do we, that this is a substantial amount, well above most emotional distress awards. Given the District Court's detailed analysis of the total evidence presented, however, and our extremely deferential standard of review, we are not prepared to conclude that the award lies outside the bounds of reason. Clearly, this was not a typical case and Evans' emotional trauma cannot"be

14

cavalierly dismissed." Blakely, 992 F. Supp. at 734. We are convinced that in fixing the remittitur the District Court has "endeavored to follow [our] instructions, consider similar cases, evaluate the evidence and determine a damages figure that [was] rationally related to [that] evidence, mindful that `[t]he determination of that amount may not be precisely calculated.' " Id.  992 F. Supp. at 739 (quoting Gumbs, 823 F.2d at 774). We cannot say that the amount awarded by the District Court demonstrated a manifest abuse of discretion. Consequently, we will not disturb the award.

VI.

The last of the alleged errors in the District Court's treatment of damages -- the decision not to submit the issue of punitive damages to the jury -- is raised by Evans in her cross appeal. According to Evans, "[t]he District Court dismissed the punitive damage count against the [Port Authority], ruling that the [Port Authority] is entitled to sovereign immunity under the Eleventh Amendment."

Evans misstates the basis for the District Court's ruling. The District Court did not hold that the Port Authority was immune from suit in federal court under the Eleventh Amendment.6 It held, instead, that the Port Authority, a hybrid entity with many of the characteristics of a municipality, is subject to suit but is, nonetheless, immune from punitive damages.

The District Court's conclusion is supported by the caselaw. In Bolden v. Southeastern Pa. Transp. Auth., 953 F.2d 807 (3d Cir. 1991), we found that punitive damages may not be assessed against SEPTA, the regional transit

_____

6. The authority cited by Evans is, therefore, inapposite. See College Sav.
Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666 (1999) (holding that sovereign immunity of State of Florida was neither abrogated by Trademark Remedy Clarification Act, nor voluntarily waived by Florida's activities in interstate commerce); and Seminole Tribe of Fla.
v. Florida, 517 U.S. 44, 54 (1996) (holding that despite Congress' construction of the Indian Gaming Regulatory Act and clear intent to abrogate sovereign immunity, the Indian Commerce Clause did not grant Congress that power).

15

authority created by the Commonwealth of Pennsylvania. We relied on the Supreme Court's decision in City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981), finding that municipalities are not subject to punitive damages under 42 U.S.C. S 1981:

> The thrust of the Court's discussion in City of Newport was that punitive damage awards against municipalities would not serve the goals of punishment or deterrence in the same way as punitive damage awards against individuals found to have violated Section 1983. This reasoning is fully applicable to SEPTA. Awarding punitive damages against SEPTA might result in increased taxes or fares and thus punish taxpayers and users of mass transportation who cannot be regarded . . . as bearing any guilt for constitutional violations that SEPTA may commit. Similarly, the deterrent effect that such awards may have on SEPTA decision makers is far more speculative than the deterrent effect of punitive damage awards on individuals who violate Section 1983, and other means of deterring violations by SEPTA officials . . . are readily available. Finally, SEPTA would be a tempting target for large punitive damage awards by juries unduly influenced by SEPTA's size and revenues. . . .

Bolden, 953 F.2d at 830–31 (citations omitted). We affirmed a decision of the District Court applying a similar analysis to conclude that the Port Authority, "as a hybrid entity with substantial connections to government, may not be assessed punitive damages" in King v. The Port Authority of New York and New Jersey, 909 F. Supp. 938 (D.N.J. 1995), aff'd, 106 F.3d 385 (3d Cir. 1996). A number of other District Courts have reached the same conclusion. 7  See

_____

7. Only one District Court has reached a contrary result. In Kondakjian v. Port Auth. of N.Y. and N.J., No. 94 Civ. 8013, 1996 WL 280799 at *1 (S.D.N.Y. May 24, 1996), the District Court relied on the Supreme Court's decision in Hess v. Port Authority Trans–Hudson Corp., 513 U.S. 30 (1994). There, the Supreme Court found that the Port Authority was not entitled to the Eleventh Amendment immunity applicable to states and state agencies, noting that the Port Authority is structured to be and is, in fact, financially self–sustaining. We agree with other District Courts

16

Vernon v. Port Auth. of N.Y. and N. J., 154 F. Supp. 2d 844
(S.D.N.Y. 2001) (holding that entities, like Port Authority,
created by bi-state compact should not be liable for
punitive damages); Ryduchowski v. Port Auth. of N.Y. and
N.J., No. 96-CV-5589, 1998 WL 812633 (E.D.N.Y. Nov. 19,
1998) (same); Brady v. Port Authority of N.Y. and N.J., Nos.
93 Civ. 1679, 95 CV 0442, 87 CV 2702, 1998 WL 724061
(E.D.N.Y. Oct. 15, 1998) (same); Recreation World, Inc. v.
Port Auth. of N.Y. and N.J., Nos. 96 Civ. 5549, 97 Civ. 5029,
1998 WL 107362 (S.D.N.Y. March 19, 1998) (same); Rose v.
Port Auth. of N.Y. and N.J., 13 F. Supp.2d 516 (S.D.N.Y.
1998) (same); Shifa Services, Inc. v. Port Auth. of N.Y. and
N.J., No. 96 Civ. 1361, 1997 WL 563301 (S.D.N.Y. Sept. 8,
1997) (same).

We are persuaded by the analysis adopted by these
courts and conclude that the same considerations that
underlay our decision in Bolden support the conclusion
that the Port Authority, like SEPTA, is immune from
punitive damages. We agree with the Court's analysis in
Shifa that:

> Considerations of public policy, including the goals of
> punishment and deterrence of constitutional violations,
> do not "dictate a contrary result." Although taxes
> would not be affected by the award of punitive
> damages against the Port Authority because it receives
> no tax revenues and is financially independent of New
> York and New Jersey, an award of punitive damages
> might result in increased tolls, fares, and other
> expenses borne by the public generally. The users of
> Port Authority facilities cannot be regarded, "except
> perhaps in an indirect and abstract sense," as bearing
> any guilt for constitutional violations committed by the

_____

which have considered the applicability of Hess  to punitive damage
awards. These courts have held that the question considered by the
Supreme Court in Hess -- immunity from suit in federal court under the
Eleventh Amendment -- presents different considerations from the
question of a public authority's immunity from punitive damages under
Section 1983. The decision in City of Newport  supplies the appropriate
framework for analysis. See, e.g., Shifa Services Inc., 1997 WL 563301 at
*4.

17

> Port Authority. Also, the deterrent effect of punitive damage awards on the Port Authority is more speculative than the deterrent effect of punitive damage awards on individuals who violate Section 1983. Other means of deterring violations by Port Authority officials are already available. . . .

1997 WL 563301 at *5 (citations omitted). Based on this reasoning, we find that the District Court did not err in refusing to submit the issue of punitive damages to the jury.

VII.

We turn last to the Port Authority's challenge to the $635,555.71 fee award approved by the District Court. As the prevailing party in this action, Evans is entitled to recover attorney's fees and costs. See 42 U.S.C. S 1988(b) (providing, in the court's discretion, a reasonable attorney's fee to a successful litigant in 1981 and 1983 actions). "In cases like this, we use the `lodestar' formula, which requires multiplying the number of hours reasonably expended by a reasonable hourly rate." Loughner v. Univ. of Pittsburgh, 260 F.3d 173, 176 (3d Cir. 2001).

The Port Authority argues that the fee award should be reduced, asking us to review both the hourly rates and the duplicative nature of the billings. We review the reasonableness of an award for attorney's fees under an abuse of discretion standard. Rode v. Dellarciprete, 892 F.2d 1177, 1182 (3d Cir. 1990). What standards to apply in calculating a fee award is a legal question subject to plenary review. Keenan v. City of Philadelphia , 983 F.2d 459, 472 (3d Cir. 1992). We will not disturb the District Court's determination of an attorney's marketplace billing rate and number of hours reasonably expended absent clear error. Washington v. Philadelphia County Court of Common Pleas, 89 F.3d 1031, 1035 (3d Cir. 1996).

The facts surrounding the District Court's determination of the fee award are particularly important to the issues raised by the Port Authority. In September 1999, counsel for Evans filed a request for attorney's fees and a certification with respect to hourly rates. The District Court

18

was asked to approve an award in the amount of $953,333.56. This amount included a lodestar of $628,027.50, costs and expenses totaling $7,483.21, and an upward enhancement of fifty (50%) percent. The fee application was first considered by the District Court in April 2000, when argument on post-trial motions was heard.

At that time, the Port Authority opposed the fee request, arguing first that the information submitted by counsel for Evans was insufficient to support the requested billing rate of $300 per hour. In response to this argument, the following exchange took place:

> The Court: What support has been adduced in the record for the hourly rates charged by Mr. Ridley and Mr. Hamlin? Aside from the certifications?
>
> Mr. Ridley: Your Honor, we did not take affidavits of the community of lawyers that are involved in Civil Rights cases. I could have called Neil Mullen. I could have called some other folks that I know who do this type of litigation.
>
> The Court: I think what really Mr. Burke is saying is that you should have as well as could have . . . .
>
> Neither side has produced the kind of evidence that [the] Third Circuit seems to be adverting to in the Hurley case. The Port Authority challenged the hourly rate and it didn't produce any record evidence as[to] why. And the plaintiff did not produce record evidence for me to consider as to why its hourly rate is appropriate.

(Evans. App. H. p. 88-89)

The court then directed the parties to file affidavits as to the customary and proper rate to be applied in this case --"whether or not when Ridley and Hamlin say $300 an hour is a reasonable amount . . . in the context of the civil rights case litigated up here in Northern New Jersey." These affidavits were not adversarial and, consequently, were not to be served on or responded to by the other side. Evans' attorneys' affidavits were to be filed on April 28th and the Port Authority's were due Friday, May 5th, by 5 o'clock. (Id.

19

p. 122) The Port Authority's counsel was admonished to "be on time when you file it."

At the same hearing, counsel for the Port Authority argued that the fee request was unreasonable, too, because the billing sheets showed duplicative effort by Evans' attorneys. The Court rejected this argument, stating:

> I have reviewed the amount of hours that have been requested and . . . . I have to agree with Mr. Hamlin; that when the decision was made not [to] try the case alone that it was an appropriate decision and a decision in this increasing[ly] difficult area of the law, or any area of the law, is a wise decision that cases that get tried alone very often are overwhelming the attorney in trying to do it. . . [I]t was very evident that it was a good thing that Mr. Hamlin and Mr. Ridley [were] there . . . .

> I am not offended that both lawyers were working on this case both during the trial, nor at times during the preparation of the case whether it was witness prep[,] attendance of depositions and the like. And therefore, I don't find that the number of hours requested for those particular efforts to be excessive. And the Court is not obliged to go line, by line, by line. And I am aware there was an effort and I think there was an appropriate effort on the part of the defendant to bring to the Court's attention several lines of billing where there was a challenge. But in all it seems to boil down to whether or not more than one attorney was working on a case at a given time and I've already indicated that I find that it is appropriate that did not go on throughout the entire case.

> I find too, that on those occasions when Mr. Hamlin billed for 18 hours, I hate to say it, but I have done that too. We have all done it. Then Mr. Hamlin didn't do it so often to make the request outrageous . . ., it is very very hard and it is very time consuming. The total legal fee requested in excess of $600,000 based upon the hourly rate requested by these attorneys, whether or not I'll let the hourly rate stand I cannot tell you until I have the kind of record evidence that I have

20

> requested from counsel. But I don't find [in] a case that
> went for this long with motion practice and depositions
> and review of documents and a full blown trial, and a
> fight to the finish that -- that amount of fees for two
> attorneys working on a case strikes me outrageous.

(Evans' App. H, pp118-19)

On May 11, 2000 the District Court issued a not-for-publication opinion addressing attorney's fees. The court first noted that counsel for Evans had made a timely filing of certifications addressing the propriety of the $300 hourly rate. The court also noted that attorneys for the Port Authority, although specifically directed to do so, did not file counter-certifications by the May 5 deadline. 8 The District Court wrote:

> The [Port Authority] submission was not provided to
> the Court on time, even though the May 5 deadline
> gave [the Port Authority] a full three weeks to obtain
> outside opinions and [the Port Authority] had already
> had [Evans'] certification of services for months.
> Instead, on May 8th, the Court received a letter from
> [counsel for the Port Authority] enclosing a newspaper
> article, which he uses as a basis for his contention that
> the court must hold a hearing on the fee application.

Evans v. Port Auth. of N.Y. and N.J., No. 95-5094, letter opinion, p. 1-2 (D.N.J. May 11, 2000).

While the District Court recognized that a hearing on fees may be required in some instances, it found that a hearing could only be helpful "in the context of a proper presentation of evidence on what the reasonable market rate actually is." Id. at 2. The Court found that holding a hearing would not be productive in this case because"the [Port Authority] has failed to offer any information on this subject." Id. The court then wrote: "[I] will not further add to the time and expense expended on this case by delaying

_____

8. The Port Authority did file an affidavit bearing on appropriate hourly rates which was hand-delivered to the District Court five days late, on May 10th. Because this affidavit was not timely, it was not considered by the District Court.

decision on the reasonable hourly rate . . . based upon the competent evidence provided to me." Id.

The court summarized this evidence as follows:

> I have reviewed Certifications from two attorneys, Robert Woodruff and Bruce P. McMoran.9  Both have significant experience in the area of employment law. Their conclusions are reasonable, and the information their certifications have provided to the court regarding hourly rates has been helpful. Accepting that the Third Circuit has disapproved of a district judge relying solely on personal knowledge in evaluating the reasonableness of an hourly rate, Hurley, 174 F.3d at 132, it is nonetheless pertinent to note the referenced certifications tell me nothing unexpected or surprising about hourly rates charged in the community . . . . The requested hourly rates charged by Mr. Hamlin and Mr. Ridley are approved.

Id.

With respect to the Port Authority's allegation of excessive hours and unreasonable duplication of effort, the Court wrote:

> On the record of proceedings held April 14th, I addressed the [Port Authority]'s objections about the amount of time spent and what it was spent for . . .. There is nothing new before me to disturb my decision to accept as reasonable the number of hours set forth by [Evans'] attorneys in their Certifications.

_____

9. McMoran certified that he was a New Jersey attorney specializing in employment law and that his hourly rate was set at $375 per hour in July 2000, and that his rate had been $350 per hour from Jan. 1997. He did not say anything about community rates generally.

Woodruff certified that he had been a civil rights attorney for twenty years and that he found the request for a $300/hr fee "to be within the framework of what might be expected to be awarded in the Essex County area." He noted that in 1994, a New Jersey state court set counsel fees in an NJLAD case at $275/hr. "[A]n hourly fee of $285.00 per hour awarded in 1994-1995 in Flemington offers a reasonable basis upon which a Court could consider an award of $300.00 per hour for a trial in Essex County in 1999." (Port Auth. App. V. III, p 91 et seq.)

22

Id. at 2–3. The District Court denied an additional fee award covering time spent in post-trial matters, finding that such an award would "stray[ ] outside the reasonable circle to be drawn around legal services. . . ." Id. at 3. The Court also declined to award an enhancement based on result or performance.

In order to establish whether the approved fee award was reasonable, we turn first to the District Court's acceptance of the $300 hourly rate. An attorney requesting a fee award must establish that rate with reference to "the community billing rate charged by attorneys of equivalent skill and experience performing work of similar complexity." Student Public Interest Research Group v. AT&T Bell Laboratories, 842 F.2d 1436, 1450 (3d Cir. 1988). A fee applicant bears the burden of documenting the applicable hourly rate. In re TuTu Wells Contamination Litigation, 120 F.3d 368, 391 (3d Cir. 1997).

A District Court may not set attorney's fees based on a generalized sense of what is usual and proper but "must rely upon the record." Smith v. Philadelphia Housing Authority, 107 F.3d 223, 225 (3d Cir. 1997) (quoting Coleman v. Kaye, 87 F.3d 1491, 1516 (3d Cir. 1996)). "The plaintiff bears the burden of producing sufficient evidence of what constitutes a reasonable market rate for the essential character and complexity of the legal services rendered in order to make out a prima facie case." Smith, 107 F.3d at 225. Once the plaintiff has made the prima facie showing with respect to the appropriate hourly rate, that rate may be contested, "but only with appropriate record evidence. In the absence of such evidence, the plaintiff must be awarded attorneys' fees at her requested rate." Id. (citations omitted) (emphasis added).

Here, the District Court found that counsel for Evans succeeded in making a prima facie showing that $300 per hour was a reasonable market rate. There is nothing in the record to suggest that the rate set was clearly erroneous. This case presents an unusual situation, unlikely to recur, in that the Port Authority failed altogether to challenge the requested rate. Had the Port Authority met its obligation to contest that rate in a timely manner it might well have been able to establish that a lower rate was appropriate. Given

23

the state of the record the District Court properly accepted the $300 hourly rate.[10]

We address next the Port Authority's contention that the fee award was inflated when Evans' attorneys each billed for work on the same projects. We have said that attorneys seeking fees must document the hours for which payment is sought "with sufficient specificity to allow the District Court to determine whether the hours claimed are unreasonable for the work performed." Washington, 89 F.3d at 1037. We have defined this to mean that the petitioning attorney must include fairly definite information as to hours devoted to various general activities, e.g., partial discovery, settlement negotiations, and the hours spent by various classes of attorneys. Id. at 1038. The billing records submitted by Evans' attorneys were specific enough to meet this standard.

Once these records were submitted, the District Court was required to perform a "positive and affirmative function in the fee fixing process." Maldonado v. Houstoun, 256 F.3d 181, 184 (3d Cir. 2001). A District Court is obligated to "review the time charged, decide whether the hours set out

_____

10. The Court summarized events relating to the determination of the hourly rates as follows:

> The Court ordered both parties to submit certifications of other practitioners by April 28, 2000. This directive was objective and specific, and as such did not require that the submissions be made in an adversarial, point-counter point fashion. After all, [the Port Authority] had known for months what [Evans'] attorneys were defending as an appropriate hourly rate. For this reason, submissions were due from both parties on the same date. While [Evans] submitted [her] certification on time, [the Port Authority] requested and was granted a week extension to May 5th. Seen in the context of the court's directions of April 14th,[the Port Authority]'s claim that it received only one week to submit its certification while [Evans] received two weeks is wholly without merit . . . [The Port Authority's] work should have begun on April 14th, and since its submission was not due until May 5th, [the Port Authority] had more time, not less time than[Evans]. In light of this . . . I will not reconsider my decision to disregard defendant's certification.

(Port Auth. App. V. I, p 13-14).

24

were reasonably expended for each of the particular purposes described and then exclude those that are `excessive, redundant, or otherwise unnecessary.' " Id. (quoting Pub. Int. Research Group of N.J., Inc. v. Windall, 51 F.3d 1179, 1188 (3d Cir. 1995)). "Hours that would not generally be billed to one's own client are not properly billed to an adversary." Id. "[T]he district court retains a great deal of discretion in deciding what a reasonable fee award is . . . ." Bell v. United Princeton Properties, Inc., 884 F.2d 713, 721 (3d Cir. 1989). We have recognized that"[i]n determining whether the fee request is excessive . .. the court will inevitably be required to engaged in a fair amount of `judgment calling' based upon its experience with the case and its general experience as to how much time a case requires." Id.

Despite the considerable discretion reserved to the District Court in the setting of a fee award, our role in reviewing that award is "not merely a passive[one]." Maldonado, 256 F.3d at 184. Accordingly, we have examined the billing records submitted by Evans' attorneys in light of the Port Authority's contention that the duplication of effort on the part of Evans' attorneys was excessive and unreasonable. Our review discloses multiple instances of duplicative billing for tasks which could not reasonably have required the identical expenditure of time by two partners, each billing at $300 per hour. For example, each of Evans' attorneys billed 23 hours for the drafting of the complaint in this matter. Substantial identical hours were also billed by each attorney for preparing interrogatories, preparing for and attending depositions, reviewing letters, and reviewing the Port Authority's disclosures. Both attorneys were present at trial and each billed time at the full hourly rate.

These instances of precise overlap in both time and task cause us to conclude that the time claimed is not reasonable for the services performed. "Given[these attorneys'] professed expertise . . ., it would not have been unreasonable to expect" that one of them would have been able to handle most aspects of this matter, including the trial "alone or with the help of an associate." Lanni v. New Jersey, 259 F.3d 146, 151 (3d Cir. 2001). For those tasks

25

where it is abundantly clear that the time of two attorneys was reasonably required, we have suggested that"awarding fees for [one partner's] time multiplied by an associate's rate may be justifiable." Id. Given the fairly straightforward nature of this case, we anticipate that the District Court will find that few tasks required the full participation of both attorneys.

It is important that we reiterate our admonition in Maldonado that fee requests be subjected to a thorough and searching analysis. Contrary to the suggestion of the District Court, it is necessary that the Court "go line, by line, by line" through the billing records supporting the fee request. Our review of these records convinces us that the total time billed and the extent of the overlap in work performed by Evans' attorneys were extraordinary, and demand more than the cursory examination conducted by the District Court.

In finding that the fee award is excessive, we do not ignore the District Court's opinion that substantial fees were warranted based on the length of the litigation, the "full blown" trial and the fact that the litigation was particularly contentious. Nor do we discount the fact that fees were driven up, in part, because the Port Authority failed repeatedly to meet time demands imposed by the court, necessitating expenditure of additional time and effort to secure compliance. Nonetheless, we are convinced that the award approved by the District Court more than accounts for these factors, appears excessive, and must be reduced substantially. Although its initial analysis of the fee petition was inadequate, the District Court remains "in the best position to know the complexity of the issues presented and the nature and quality of the work performed by [Evans'] attorneys." Loughner, 260 F.3d at 182 (Nygaard, J., concurring and dissenting). Accordingly, we will not reduce the fee award ourselves, but will vacate the order of the District Court approving the award of attorney's fees and will remand this matter for recalculation of the award.

VIII.

For the foregoing reasons, we will affirm in all respects the May 11th order of the District Court denying the Port

26

Authority's request for a judgment N.O.V. or, in the alternative, for a new trial. We will, however, vacate the judgment and remand this matter to the District Court for a new trial on the limited issue of compensatory damages for emotional distress unless Evans elects to file a remittitur of damages in excess of $375,000. We will vacate the separate May 11th order of the District Court awarding Evans' counsel attorney's fees and will remand this matter for recalculation of the fee award.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

27